Troiani Group and Troy Development   :
Associates, L.P.,                        :
                Appellants      :
                                :
          v.                   :
                                :
City of Pittsburgh Planning       :
Commission, City of Pittsburgh and   :   No. 85 C.D. 2021
Lumania Properties, L.P.         :   Argued: May 13, 2021

BEFORE:   HONORABLE ANNE E. COVEY, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                          FILED: March 21, 2022

        Troiani Group and Troy Development Associates, L.P. (collectively, Troiani) appeal from the Allegheny County Common Pleas Court's (trial court) January 11, 2021 order affirming the City of Pittsburgh (City) Planning Commission's (Commission) August 18, 2020 decision (Decision) denying Troiani's Project Development Plans (Plans) seeking approval to demolish Troiani-owned vacant structures located in the City at 100-104 Market Street[1] and 106 Market Street[2] (Market Street Structures).[3, 4] Troiani presents three issues for this

---

[1] Record documents also refer to the buildings at 100-104 Market Street as the building at "100-102 Market Street," *see, e.g.*, Reproduced Record (R.R.) at 387a, 390a, 393a, and the building at "104 Market Street." *See, e.g.*, R.R. at 411a, 412a.

[2] Record documents also reference the building located at 106 Market Street as "106/108 Market Street" or "106-108 Market Street." *See, e.g.*, R.R. at 420a, 421a, 428a-430a, 456a.

[3] Project Development Plan 18-PDP-00049 addressed the demolition of the structures at 100-104 Market Street. Project Development Plan 18-PDP-00050 addressed the demolition of the structure at 106 Market Street.

[4] Intervenor Lumania Properties, L.P. (Lumania) owns property neighboring the Market Street Structures. It has filed a brief requesting this Court dismiss Troiani's appeal.

Court's review: (1) whether the Commission erred by misapplying the review standard, by capriciously disregarding expert testimony, and by treating speculative testimony as if it were substantial; (2) whether the Commission improperly invented a prerequisite for demolition-only applications that does not appear in the City Zoning Code (Zoning Code);[5] and (3) whether the Commission exceeded its authority by effectively declaring the Market Street Structures to be *historic* outside of the standards and due process afforded under the City's Historic Preservation Ordinance[6] and the Fifth Amendment to the United States Constitution.[7] After review, this Court affirms.

The Market Street Structures are located in the Golden Triangle (GT) - C District in downtown Pittsburgh.[8] They were built between the 1860s and 1910s, and consist of a brick commercial building with two, three, and four-story segments, and a brick three-story commercial building. *See* Reproduced Record (R.R.) at 314a. The Market Street Structures are not located in a *locally* designated historic district,

---

[5] *See* https://library.municode.com/pa/pittsburgh/codes/code_of_ordinances?nodeId=PIZOCO_TITNINEZOCO (last visited Mar. 18, 2022).

[6] "Title XI of the Zoning Code was enacted to 'preserve and restore the qualities of the [City] relating to its history, culture, and tradition' and the 'harmonious outward appearance of structures[.]' [Zoning Code] § 1101.01(b)." *Meyer v. City of Pittsburgh Hist. Rev. Comm'n*, 201 A.3d 929, 937 (Pa. Cmwlth. 2019).

[7] U.S. Const. amend. V.

[8] The GT District is divided into five subdistrict classifications - Subdistricts A, B, C, D, and E. *See* Zoning Code § 910.01.B. The GT District's purposes are described in Section 910.01.A of the Zoning Code:

> 1. Maintain and enhance the Golden Triangle as the economic and symbolic core of the region;
>
> 2. Support and develop commercial, office and cultural uses; and
>
> 3. Develop an attractive, pedestrian-oriented physical environment with a design quality that recognizes the [GT's] regional significance.

Zoning Code § 910.01.A.

but are located in, and are deemed to contribute to, the Firstside National Register Historic District.

Troiani filed applications with the Commission for approval to demolish the Market Street Structures pursuant to the Plans. The Plans were limited to the proposed Market Street Structures' demolition and no application for any development apart from the proposed demolitions was filed prior to the Commission's decision. Although a Troiani-owned building located at 209 First Avenue (First Avenue Structure), on property located adjacent to the Market Street Structures, was previously part of the Plans' demolition requests, the Department of Permits Licenses and Inspections' (PLI) Board of Standards and Appeals (Board) approved immediate demolition of the First Avenue Structure on June 26, 2020, as it is in imminent danger of collapse.[9] Prior to Troiani's request for the Commission's approval of the Plans, PLI staff determined that the Market Street Structures did not constitute an immediate risk of imminent danger to the public.

In seeking the Commission's approval, Troiani submitted a Historic Property Assessment of the Market Street Structures, which the City Planning Historic Preservation staff reviewed. Troiani also submitted structural viability

_____

[9] The Board's denial of Troiani's request to demolish the Market Street Structures as a necessary precursor to the First Avenue Structure's safe demolition (First Avenue Demolition Application) was the subject of a separate appeal at *Troiani Group & Troy Development Associates, L.P. v. City of Pittsburgh Board of Appeals & City of Pittsburgh*, 260 A.3d 106 (Pa. Cmwlth. 2021), argued seriately with the instant appeal. In that appeal, this Court vacated the trial court's decision affirming the Board's decision and remanded the matter with direction that the trial court vacate the Board's Decision and expeditiously remand the matter to the Board to issue a decision based on the existing record evidence. On July 26, 2021, the Board, on remand, again denied Troiani's First Avenue Demolition Application. Troiani appealed to the trial court. On September 7, 2021, the trial court reversed the Board's decision. On October 6, 2021, the City appealed to this Court from the trial court's order at *Troiani Group & Troy Development Associates L.P. v. City of Pittsburgh Board of Appeals & City of Pittsburgh* ___ A.3d ___ (Pa. Cmwlth. No. 1127 C.D. 2021, filed Mar. 21, 2022).

inspection reports regarding the Market Street Structures' condition. Individuals and organizations submitted letters supporting and opposing the Plans.

The Commission held hearings on June 30 and July 14, 2020. At the June 30, 2020 hearing, Troiani's president, Michael Troiani, explained that historic preservation specialists and structural engineers recommended the Market Street Structures' demolition. He also discussed the Market Street Structures' condition, his attempts to restore them, and his unsuccessful efforts to develop and re-use them.

Troiani's project architect, Ken Doyno (Doyno), described Troiani's new development goals, the Market Street Structures' structural conditions, and the events leading to the requested demolition. Doyno also presented proposed options for new, post-demolition development, and discussed working with community organizations, including the Pittsburgh History and Landmarks Foundation (PHLF) and the Young Preservationists Association (YPA), to develop the Plans and the new development proposals. Doyno stated that a study performed on PHLF's behalf by IKM Architecture (IKM) concluded that restoring the buildings would cost approximately $8 million, but would return only approximately $5 million, thereby creating a $3 million gap. *See* R.R. at 64a.

John Jackson (Jackson), a senior vice president for real estate brokerage firm Cushman and Wakefield, appeared on Troiani's behalf and presented a report describing the residential and commercial leasing market in the subject area. According to Jackson, rehabilitating the Market Street Structures would not be commercially viable given their design, their deteriorating condition, and the current real estate market conditions.

Chuck Cornely (Cornely), Troiani's registered structural engineer, presented reports describing the Market Street Structures' condition, and explained that, due to the use of inferior quality brick, and the buildings' deterioration, the

4

Market Street Structures are not structurally sound and the building materials are not suitable for re-use.

Lee Riccetti (Riccetti), an associate with Heritage Consulting Group, which Troiani retained to research the Market Street Structures' history, and to assess their significance, presented her analysis.[10] She related that nothing in her research indicated that the Market Street Structures were "of outstanding significance." R.R. at 131a. Riccetti further noted that none of the tenants in the late 19th and early 20th centuries were of historical importance. Riccetti explained that the Market Street Structures are not of a particular architectural style. She stated: "There is very little historic fabric remaining. There just isn't much left to connect the building to that period of significance aside from . . . the brick on the outside." R.R. at 133a-134a. Riccetti concluded that "these buildings are fairly common throughout the district." R.R. at 135a.

At the July 14, 2020 hearing, numerous witnesses appeared in opposition to the Plans. PHLF's director, Karamagi Rujumba, reported PHLF's efforts to identify alternatives to demolishing the Market Street Structures, including hiring IKM to conduct a comprehensive design analysis. *See* R.R. at 194a-195a. Melanie Como Harris (Como Harris), a historical architect with 25 years of

___

[10] Riccetti represented that she holds a Master's of Science degree in historic preservation with a certificate in urban redevelopment, and a Bachelor of Arts degree in urban studies and architectural studies. *See* R.R. at 124a. She explained that Heritage Consulting Group

> consult[s] with real estate developers on historic real estate[,] ushering projects through local, federal, and state planning processes and that includes incentives like historic tax credits.
>
> This also includes assessing the historic significance of the buildings as [the firm has] done in this case for Troiani. [It has] listed thousands of buildings in the National Register since [the] firm was established in 1982 and ha[s] worked in nearly every state in the U[nited] S[tates].

R.R. at 125a.

5

experience representing IKM as an architectural consultant to PHLF, spoke and also submitted an analysis (IKM Report) asserting that the Market Street Structures could be restored. PHLF vice president, Michael Sriprasert (Sriprasert), appeared and opined that, based on IKM's analysis, a restoration project for the Market Street Structures would be more economically viable than the post-demolition projects proposed by Troiani. Sriprasert further challenged Troiani's contention that the $3 million gap identified in the IKM Report rendered any restoration non-viable.

> Sriprasert explained:
>
> Unfortunately, what the [C]ommission heard [at the June 30, 2020 hearing,] were only the financial aspects of the restoration or the restoration scenarios.
>
> These projects, restoration or new construction, need subsidy. I remember a number of $3 million was talked about for a -- a financial gap, if you restored the buildings, and those were numbers that we came up with. We did very similar buildings down the street on Market [Street]. We know what it takes. That was a gap.
>
> Unfortunately what you didn't hear was the -- was the financial scenario for a new construction building of this scale, of this magnitude. From our analysis, talking with our architects and construction folks, looking at this square footage, we estimated that the project would cost in excess of [$100] million [], but when you look at the rental rates for office, for residential, for retail, that we have today, and -- and what that can support in terms of equity and debt, the gap is substantially higher; in fact, 15 times higher than if you were to just restore these buildings, so that $3 million gap turns into nearly a $50 million gap potentially, and maybe higher.
>
> Those funds would need to be sought from likely government sources, private capital wouldn't go in there because there might not be a -- [] a return, and with that, because of such a large gap to fill, the possibility of a site that is cleared that may sit there for years and years is very high, and for that reason we feel that the project being proposed is not viable at this time.

6

R.R. at 216a-218a.

PHLF director of real estate and finance, David Farkas (Farkas), also spoke in opposition to the Plans. He explained that he is responsible for leasing and managing the seven commercial properties PHLF developed and owns in Market Square and along Wood Street. Farkas opined that Troiani's intended post-demolition development is not economically viable given changes in the City's commercial real estate market, in part, due to the COVID-19 pandemic and resulting work-from-home positions, and a current glut of available office and luxury apartment space.

Matthew Craig, YPA's executive director, expressed concerns about clearing the "historic" Market Street Structures for an uncertain, unfunded building project. R.R. at 209a. Other individuals also appeared in opposition to the demolition, expressing their concerns regarding the loss of the buildings' historic character, demolishing the Market Street Structures without a development plan to replace the buildings, concerns that the location would remain a vacant lot, and concerns about the viability of Troiani's proposed new construction. At the close of the July 14, 2020 hearing, the Commission voted to deny the Plans without prejudice. On August 18, 2020, the Commission issued its written Decision denying the Plans without prejudice.[11]

---

[11] Lumania preliminarily argues that the trial court should have dismissed the instant appeal. It reasons that, on August 14, 2020, Troiani initially appealed from the Commission's Decision announced on July 14, 2020 (which the trial court later quashed as untimely). Notwithstanding Troiani's pending appeal from the July 14, 2020 decision, Troiani also appealed from the Commission's Decision on September 4, 2020. Lumania contends that Troiani's appeal from the July 14, 2020 decision divested the Commission of jurisdiction to issue the Decision and, thus, there was no Decision from which to appeal.

However, this Court has explained:

> [A]ll **zoning decisions are not final until a written decision is issued**, and **until a written decision is issued**, **there is no order to appeal**. "The decisional law of this Commonwealth confirms that a final order of a [ZHB] must be reduced to writing." *See also Pendle*

7

On September 4, 2020, Troiani appealed to the trial court. On January 11, 2021, the trial court affirmed the Commission's Decision, and denied and dismissed Troiani's appeal. Troiani appealed to this Court.[12]

Initially, Section 922.10.B of the Zoning Code provides that, "in addition to conforming to any and all regulations pertaining thereto that are specifically set forth in this Zoning Code, **developments** shall be in accord with a Project Development Plan approved by the Commission." Zoning Code § 922.10.B (emphasis added). Section 926.67(e) of the Zoning Code defines "development" to include "[d]emolition of a structure . . . ." Zoning Code § 926.67(e).

Section 922.10.E.2 of the Zoning Code mandates the Commission's consideration of 13 designated criteria for Project Development Plan approval as follows:

> In reviewing applications for Project Development Plan approval, the . . . Commission shall consider the extent to which the Project Development Plan addresses the following criteria. **The . . . Commission shall not approve any Project Development Plan that**, **in the determination of the** . . . **Commission**, **does not**

*Hill v. Zoning Hearing B*[*d.*] *of Nether Providence T*[*wp.*], 134 A.3d 1187 (Pa. Cmwlth. 2016); *Seipstown Vill., LLC v. Zoning Hearing B*[*d.*] *of Weisenberg T*[*wp.*], 882 A.2d 32 (Pa. Cmwlth. 2005) (citing *Relosky v. Sacco*, . . . 523 A.2d 1112 ([Pa.] 1987)).

*First Ave. Partners v. City of Pittsburgh Plan. Comm'n*, 151 A.3d 715, 722 (Pa. Cmwlth. 2016) (emphasis added; footnote omitted). Because the Commission had not yet issued the Decision, "there [was] no order to appeal" on July 14, 2020, and Troiani's original appeal attempt did not deprive the Commission of jurisdiction to issue the Decision.

[12] The standard of review in an appeal of a local agency decision, where the trial court has taken no additional evidence [as is the case here], is whether constitutional rights have been violated, whether an error of law has been committed, or whether a finding of fact of the agency necessary to support its adjudication is not supported by substantial evidence.

*Meyer*, 201 A.3d at 935 n.6.

8

**adequately address one (1) or more of these criteria** in accordance with objectives contained in general or site specific policy documents adopted by the . . . Commission.

(a) The proposed development must include retail facilities, where such facilities would maintain and continue the existing retail patterns;

(b) The proposed development must address compatibility with any existing residential area, including provision for maintenance of residential uses in existing residential areas;

(c) The proposed development must make provision for adequate parking . . . ;

(d) The proposed development must adequately address traffic generation characteristics . . . ;

(e) The proposed development must adequately address pedestrian traffic generation, proposed pedestrian circulation facilities and patterns . . . ;

(f) The proposed development must adequately address access to public transportation facilities . . . ;

(g) The proposed development must adequately address the preservation of **historic structures and significant features of existing buildings**, including, if applicable, the retention and reuse of structures which are **locally or federally designated historic structures**; retention and reuse of significant structures, provided that *such preservation requirements may be waived if the applicant shows that use of such structure is no longer economically or physically viable*; **and retention and reuse of structures which contribute to the character of an historically significant area;**

(h) The proposed development must adequately address architectural relationships with surrounding buildings . . . ;

9

(i) The proposed development must adequately address microclimate effects of proposed development . . . ;

(j) The proposed development must adequately address protection of views and view corridors . . . ;

(k) The proposed development must adequately address the location, development and functions of open space . . . ;

(l) The proposed development must address the project's compatibility and conformance with any overall master plans or comprehensive plans . . . ; [and]

(m) If the proposed application includes a building(s) that exceeds fifty thousand (50,000) square feet of building footprint, the proposed development must adequately address large footprint building criteria of Section 922.04.E.6 [of the Zoning Code].

Zoning Code § 922.10.E.2 (emphasis added).

Our Supreme Court stated that **the burden is on a project development plan applicant to submit evidence that shows the project development plan meets the Zoning Code's criteria** as follows:

Under [Zoning Code] Section 922.10.C, all applicants for project development plan approval are to file an application with the Zoning Administrator. [Zoning Code,] §§ 922.10.C, 922.10.D.1. . . . The [] Commission reviews the master development plan application and approves it, if it meets certain designated criteria. *Id.* When the requirements of master development plan review have been fulfilled, the Zoning Administrator schedules review of the project development plan application before the [] Commission. [Zoning Code,] § 922.10.E.1. The [] Commission then holds a public hearing, *reviews the project development*

10

> *plan application to determine whether it complies with [13] designated criteria*, and either approves, approves with conditions, or denies the application. [Zoning Code,] §§ 922.10.E.1, 922.10.E.2.
>
> *Riverlife Task Force v. Plan*[.] *Comm*[*'n*] *of City of Pittsburgh*, . . . 966 A.2d 551, 553-54 ([Pa.] 2009) (emphasis added).

*Oakland Plan. & Dev. Corp. v. City of Pittsburgh Plan. Comm'n*, 107 A.3d 873, 881-82 (Pa. Cmwlth. 2015) (bold emphasis added). "Similar to special exception applications,[13] project development plan applications are approved if **all** of a zoning ordinance's requirements are met . . . and these criteria are also presumptively compatible with the advancement of the public's health, safety, and general welfare." *Id*. at 882 (citation omitted; emphasis added).

Troiani first argues that "[o]f [the 13] criteria, . . . only Section 922.10.E.2(g) of the Zoning Code applies to a 'development' that is limited to the 'demolition of a structure.'" Troiani Br. at 35 (quoting Zoning Code § 922.10.E.2(g)). Troiani contends that it met its burden thereunder when it established that the Market Street Structures are not designated historic, they are not historically significant, and their preservation is not economically or physically

---

[13] The *Oakland Planning & Development Corp.* Court explained:

> Special exceptions are approved so long as they meet a zoning ordinance's enumerated criteria. *Bray* [*v. Zoning Bd. of Adjustment*], 410 A.2d [909,] 911 [(Pa. Cmwlth. 1980)] ("The important characteristic of a special exception is that it is a conditionally permitted use, legislatively allowed if the standards are met.") If an applicant meets the requirements for a special exception, there is a presumption that the application is consistent with the "promotion of health, safety and general welfare." *Id*. "[H]ence[,] it is logical that . . . the Pennsylvania decisions have placed on the objectors the 'burden' of showing the proposal to be detrimental to public health, safety and welfare." *Id*.

*Oakland Plan. & Dev. Corp.*, 107 A.3d 882.

11

viable. Troiani further asserts that the Commission erred by misapplying the standard of review, capriciously disregarding its expert testimony, and treating speculative testimony as substantial evidence.

Notwithstanding Troiani's contention, there is nothing in Section 922.10.E.2 of the Zoning Code limiting the applicability of its 13 criteria where a development application involves only demolition. Rather, it prohibits the Commission from approving "**any** Project Development Plan that . . . does not adequately address one (1) or more of the [13] criteria . . . ." Zoning Code § 922.10.E.2 (emphasis added). Thus, Troiani was required to comply with all 13 criteria. Moreover, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Section 1921(b) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(b).[14]

Here, the Commission appropriately concluded that the Plans did not adequately address the 13 required criteria. Specifically, the Commission explained:

> 2. In deliberation[,] **the [] Commission expressed significant concerns about approving the demolition of the existing historic structures in a prominent [d]owntown location with only a speculative plan for redevelopment of the site**, **particularly when presented with credible evidence that an office building at that location may not be financially viable**. The impact of [] such a large vacant site in that prominent location for an unknown period of time would have a deleterious impact on the surrounding architecture and character of the neighborhood.
>
> 3. Further, the [] Commission was not satisfied that [Troiani] adequately addressed the preservation of the

---

[14] "Although the Statutory Construction Act of 1972 . . . is not expressly applicable to the construction of local ordinances, the rules of statutory construction are applicable to statutes and ordinances alike." *Geerling Florist, Inc. v. Bd. of Supervisors of Warrington Twp.*, 226 A.3d 670, 676 (Pa. Cmwlth. 2020).

historic structures on the [s]ubject [p]roperties and could not conclude that the existing buildings are no longer economically or physically viable. [Troiani's] contention that new construction may be more lucrative does not justify demolition, and [Troiani] did not meet its burden of demonstrating that reuse [of] existing buildings was unreasonable or not economical. [The o]bjectors presented credible evidence and analysis that the existing buildings could be reused and remain economically viable.

4. **Reviewing the proposed demolitions without a clear plan for future development, the [] Commission found that it was unable to determine compliance with the approval criteria generally. The impact of the demolitions on retail and residential uses, parking, traffic, pedestrian activity, historic preservation, architectural design, microclimate effects, views, and open space cannot be determined without a clear understanding of how long the property might sit vacant.** While [Troiani] stated that the [s]ubject [p]roperty would not be used for parking pending new development, [**Troiani**] **did not present sufficient information that the resulting vacant lot or any temporary improvements satisfied the requirements of Section 922**.**10**.**E**.**2 [of the Zoning Code**].

R.R. at 318a-319a (emphasis added). Because the Commission concluded that Troiani failed to adequately address at least 1 of the 13 required criteria, its first argument fails on this basis alone. *See* Zoning Code § 922.10.E.2.

However, based on its belief that Section 922.10.E.2(g) of the Zoning Code was the only applicable criteria, Troiani further contends the Commission's Decision is unsupported by substantial evidence. It asserts that its expert testimony demonstrated that the Market Street Structures are not "historic structures," have no historic significance, and are "no longer economically or physically viable[,]" Zoning Code § 922.10.E.2(g), which was unrefuted, and the objectors' testimony consisted of only speculation, bald assertions, and personal opinions. *See* Troiani Br. at 34.

13

Even if Troiani was correct that only Section 922.10.E.2(g) of the Zoning Code applied to demolition applications, the Commission found that Troiani did not satisfy those requirements. Relying on the objectors' evidence, the Commission denied approval, in part, under Section 922.10.E.2(g) of the Zoning Code, based on its finding that the Market Street Structures are "considered as contributing buildings to [the Firstside National Register Historic District,]" R.R. at 314a, and its conclusion that demolition of those structures would create "a large vacant site" and "would have a deleterious impact on the surrounding architecture and character of the neighborhood." R.R. at 318a; *see also* Zoning Code § 922.10.E.2(g).[15]

Troiani characterizes the objectors' testimony supporting the Commission's finding as speculative. "[This Court has] repeatedly held that an objector cannot meet his burden with speculation." *Tower Access Grp., LLC v. S. Union Twp. Zoning Hearing Bd.*, 192 A.3d 291, 300 (Pa. Cmwlth. 2018). Further, "evidence cannot consist of mere 'bald assertions, personal opinions, and perceptions' . . . ." *Visionquest Nat'l, Ltd. v. Bd. of Supervisors of Honey Brook Twp., Chester Cnty.*, 569 A.2d 915, 917 (Pa. 1990) (quoting *Bureau of Corr. v. City of Pittsburgh*, 532 A.2d 12, 14 (Pa. 1987)). However, the Commission's finding that the Market Street Structures contribute to the Firstside National Register Historic District is supported in the record.

---

[15] Section 922.10.E.2(g) of the Zoning Code addresses the preservation of historic structures. This Court agrees that the Commission erred when it referred to the Market Street Structures as "historic structures." R.R. at 318a. Section 926.104 of the Zoning Code defines "Historic Structure" as "a building or structure that has been designated by a local authority." Zoning Code § 926.104. Because the Market Street Structures are not locally designated historic structures, this Court agrees that they are not "[h]istoric [s]tructure[s,]" as defined in the Zoning Code. *Id.* Regardless, given the Commission's conclusion that the Plans failed to adequately address 12 of the 13 criteria, any one of which requires the Commission to refuse approval, its error is harmless. *See Commonwealth v. Allshouse*, 36 A.3d 163 (Pa. 2012).

14

At the Commission's hearing, Troiani's counsel admitted that "[t]his is a contributing building to a national historic site[.]" R.R. at 22a. Michael Troiani also acknowledged, "these structures have marginal significance as contributing structures in recent 2013 federal designation." R.R. at 23a. Riccetti conceded that "[a]ll of the buildings we're discussing are listed as contributing buildings on the First[s]ide National Register [Historic] District boundary expansion that was completed in 2013[.]" R.R. at 127a. Troiani, its counsel, and witnesses attempted to minimize the existing federal designation's significance as contrasted with local historical designation. *See* R.R. at 23a, 127a-128a. However, Section 922.10.E.2(g) of the Zoning Code makes no such distinction with respect to a *contributing* structure.

Como Harris explained:

> [The Market Street Structures] contribute to a [N]ational [R]egister [H]istoric [D]istrict. Designation is an arduous and lengthy process. It recognizes that which is special and unique. The existing form to preserve is the public realm shaped by the buildings. Integrity of place is maintained by articulated volumes, not just facades. The amount of southern sky visible beyond are defined by the building heights. Removal or reinvention of the buildings around First [Avenue] and Market [Street] will surely result in visible discontinuity of the historic fabric and deteriorate the sense of place.

R.R. at 197a-198a.

The Commission also determined based on the evidence that it "could not conclude that the [Market Street Structures] are no longer economically or physically viable." R.R. at 318a. Record evidence supports this conclusion. Como Harris declared:

> The structural reports are observations without exploratory demolition or testing. The reports do not definitively state that collapse is imminent. These

15

masonry bearing walls are 16 inches thick, that's [4] [bricks] wide, thicker than most historic buildings of their scale. Only one wall of one of the buildings was observed as bowing, bricks falling is not extensive, and [sic] no mention of orange brick dust piling up at the interior walls. Masonry building rehabilitation is very straightforward. There's no limit on usable life when mortar, parapets, and roofs are properly maintained.

Our most historic cities, Philadelphia, Boston, [and] Baltimore, have maintained buildings of a variety of brick conditions for hundreds of years. PHLF has done it right here in downtown.

The masonry report clearly outlines repair. Phased rehabilitation of the most unstable walls could buy several years while [Troiani] awaits an investment partner in a market upswing that will support pro forma for the high rise. Different floor levels are negotiable.

. . . . All or partial removal of wood floor structure could achieve the floor to floor heights desired. Resources should not be reduced to vulnerable facades or piles of raw material.

Financing of a large project is many years off. The salvaged materials would have to be stored and protected indefinitely. Degradation to the historic integrity would be indefinite, if not permanent. Retaining the full volumes of these buildings provides the best solution to maintaining structural stability.

The impediments listed by [Troiani] are surmountable. [Troiani] argues these buildings are disposable. The historic designation proves otherwise. [Troiani] has no interim plan. Stabilization efforts would buy time to incorporate these resources into a long-range, high-density development. To eliminate potential integration without a tangible and approved [project development plan] would be shortsighted with long-lasting consequences.

R.R. 198a-200a.

DJ Bryant (Bryant), another IKM representative, described the IKM Report which PHLF presented to Troiani as part of its discussions therewith. Bryant explained:

> The intent behind the study was to produce a document that could be provided to [Troiani] and the project team in order to assist them in their design efforts for the proposed development at the subject properties located within the First[s]ide [National Register Historic] [D]istrict.
>
> **The study demonstrated that not only could a signature tower be incorporated onto the site**, **but it was possible to achieve this development while also preserving the historical structures**. We had three components in this study.
>
> Component No. 1 was we produced a total of eight different massing schemes for a proposed tower while also integrating the historical structures. The intent behind producing so many options was to shy away from one size fits all development approach, and to demonstrate that depending upon which variables and criteria were favored by a developer, that a multitude of options could be accommodated onto the site.
>
> It should be noted that the development schemes we -- we presented without insight and programmatic ratios provided by [Troiani]. As a baseline, however, we tried to target around 16,000 square feet to 20,000 square feet, four place sizes, in order to demonstrate that the development could be achieved on the site.
>
> Component No. 2 of this study were conceptual renderings demonstrating how the existing structures could be restored in the interim, at least until any substantial anchor tenant or investor could be acquired. The interim scheme gains further relevance when you consider the glut of office space in downtown Pittsburgh, which was [Component No. 3] of our study, a real estate analysis.
>
> At the time of our study, which we were using Quarter 3 2019 data for the central business district, which indicated 3.3 million square feet of vacant office space downtown. As of Quarter 2 of this year, that number now stands at 4

17

million square feet across Class A and B offices. That's equivalent to two U[.]S[.] Steel Towers' worth of vacant real estate downtown.

In my professional opinion, [Troiani] and his team have not performed their due diligence in this matter, and rather than being an open and participatory design process, the proposed development was pre-conceived, and there was limited space for analysis and feedback from IKM or PHLF.

R.R. at 203a-205a (emphasis added).

PHLF's President, Arthur Ziegler, stated:

We got together with [Michael] Troiani, [] Doyno, and we did not go there to stop his new building. We don't work that way with developers. We try to finds [sic] ways that [are] good for the historic buildings on the site and good for what a developer wants to do, and for that reason we employed IKM to come up with various possible plans, working together, and I think we have submitted those to the Commission. They preserve all or part of the buildings, as has been done elsewhere in [the City] and around the country, and gives [Michael] Troiani a very good new building of the size he requires.

That has not suited him, and we are sorry about that. We think they work, and we think that Market Street, our most historic street in [d]owntown Pittsburgh, should be preserved, the scale should be preserved, the building should be preserved, and our organization committed heavily to saving the other end of Market Street where the buildings were in far worse condition, the roofs were in the basement, we cleaned all the bricks, took them off site, cleaned all the historic bricks, brought them back, re-erected them, we have leased them, and we are generating a return, and yes, we did have to subsidize them and use historic tax credits, but the fact is they work, Market Street works. The only place that hasn't worked is where PPG, a nice glass building [was] built, and in 25 years couldn't lease its retail space at the first floor.

We think we can save the buildings or part of the buildings. [Michael] Troiani can have a new building, we can live congenially, and we do not want to sacrifice these

18

buildings for open land where no actual building has been proposed on a feasible basis yet.

R.R. at 223a-224a.

The above-referenced record evidence, is far more than "mere 'bald assertions, personal opinions, and perceptions' . . . ." *Visionquest*, 569 A.2d at 917. The objectors' evidence included IKM's detailed study, and testimony by IKM representatives, historical architect Como Harris, and PHLF representatives, all of whom are experienced in historical renovations, and who worked with Troiani in an attempt to reach an amicable resolution.

This Court has ruled:

> A reviewing court **must** accept the credibility determinations made by the municipal body which hears the testimony, evaluates the credibility of the witnesses and serves as fact[-]finder. The reviewing court is not to substitute its judgment on the merits for that of the municipal body. Assuming the record demonstrates the existence of substantial evidence, the court is bound by the municipal body's findings which are the result of resolutions of credibility and conflicting testimony.

*In re Thompson*, 896 A.2d 659, 668 (Pa. Cmwlth. 2006) (emphasis added; citations omitted).

In the instant matter, the Commission specifically found Farkas's testimony and Como Harris's testimony and conclusions to be credible. *See* R.R. at 316a. Troiani may not agree with the Commission's credibility determinations and factual findings, but its disagreement therewith does not mean the Commission's Decision is unsupported by substantial evidence. Rather, the Commission, as fact-finder, was entitled to weigh the evidence and determine witness credibility.

Accordingly, this Court concludes that the Commission's Decision is supported by substantial evidence. Thus, Troiani's argument to the contrary fails.[16]

Troiani next argues that the Commission improperly invented a prerequisite for demolition-only applications that does not appear in the Zoning Code when it refused to approve the Plans because Troiani had not submitted a "clear plan for future development" or "a complete Project Development Application for redevelopment of the wider site." R.R. at 319a.

Troiani's contention that there is no basis in the Zoning Code requiring that demolition-only applications may only be considered in conjunction with "a clear plan for future development," *id.*, mischaracterizes the Commission's actions. The Commission explained: "Reviewing the proposed demolition without a clear plan for future development, the [Commission] found that it was **unable to determine compliance with the** [**13 criteria** in Section 922.10.E.2(g) of the Zoning Code] generally." R.R. at 319a (emphasis added). The Commission did not dictate a standard not contained in the Zoning Code but, rather, explained that, based on the application before it, it could not conclude that Troiani had met its burden to "adequately address" the 13 criteria, absent a complete plan for redevelopment. Zoning Code § 922.10.E.2. Further, the Commission denied the Plans without prejudice and "encouraged [Troiani] to bring the application for demolition before

---

[16] With respect to Troiani's assertion that the Commission capriciously disregarded its evidence, "[a] capricious disregard occurs only when the fact-finder deliberately ignores relevant, competent evidence. Capricious disregard of evidence is a deliberate and baseless disregard of apparently reliable evidence." *Taliaferro v. Darby Twp. Zoning Hearing Bd.*, 873 A.2d 807, 814 (Pa. Cmwlth. 2005) (citation omitted). Here, as in *Taliaferro*, "application of the capricious disregard standard . . . does not warrant reversal. The [Commission's] [D]ecision plainly demonstrates it did not deliberately ignore the testimony of [Troiani's] experts, as evidenced by its express summation of their testimony." *Id.* at 815; *see* R.R. at 315a-316a. "Rather, the [Commission] considered their testimony, and chose to reject it. The . . . consideration and rejection of this evidence, by its definition, is not capricious disregard." *Taliaferro*, 873 A.2d at 815-16.

the Commission with a complete Project Development Application for redevelopment of the wider site." R.R. at 319a. The Commission did not impose a prerequisite for demolition-only applications but, rather, applying the Zoning Code's plain meaning, described Troiani's failure to adequately address the Zoning Code's required criteria. Accordingly, this Court discerns no error.

Finally, Troiani contends that the Commission exceeded its authority by treating the Market Street Structures as *historic* and/or as *contributing to the character of a historic district* without affording due process protections as provided in the City's Historic Preservation Ordinance, Section 1101.03 of the City's Code of Ordinances.[17] Further, Troiani asserts that in denying its approval for structures that have not been nominated or designated "historic" through required proceedings, the Commission violated the Takings Clause of the Fifth Amendment to the U.S. Constitution.[18] As discussed, *supra*, the Market Street Structures are not "[h]istoric [s]tructure[s]" as defined in the Zoning Code. Zoning Code § 926.104. However, evidence supported the Commission's conclusion that the Market Street Structures contributed to the character of the Firstside National Register Historic District.

This Court need not reach the constitutional issue Troiani raises. "Typically, 'when a case raises both constitutional and non-constitutional issues, a court should not reach the constitutional issue if the case can properly be decided on non-constitutional grounds.'" *Renner v. Ct. of Common Pleas of Lehigh Cnty.*, 234 A.3d 411, 417 n.6 (Pa. 2020) (quoting *Ballou v. State Ethics Comm'n*, 436 A.2d 186, 187 (Pa. 1981)). The Commission denied the Plans based on more than just the Commission's characterization of the Market Street Structures as being historic or contributing to the character of a historic district. The Commission also denied the

---

[17] Pertaining to the Designation of Historic Structures, Districts, Sites and Objects. *See* https://library.municode.com/pa/pittsburgh/codes/code_of_ordinances?nodeId=PIZOCO_TITEL EVENHIPR_CH1101HISTDISIOB#TOPTITLE (last visited Mar. 18, 2022).

[18] U.S. Const. amend. V.

application because the Plans did not adequately address the 13 criteria in Section 922.10.E.2 of the Zoning Code. Pursuant to Section 922.10.E.2 of the Zoning Code, the Commission was **required** to deny the Plans' approval where, "in the determination of the . . . Commission, [the Plans did] not adequately address one (1) or more of [the 13] criteria[.]" *Id.* In fact, the Commission determined that the Plans failed to adequately address any of the other required criteria. That failure mandated the Commission's denial, separate and apart from its denial under Section 922.10.E.2(g) of the Zoning Code.[19]

For all of the above reasons, the trial court's order is affirmed.

_____
ANNE E. COVEY, Judge

Judge McCullough did not participate in the decision in this case.

---

[19] On May 3, 2021, Troiani filed in this Court an Application to Request Judicial Notice and to Supplement the Record with the City's April 22, 2021 Condemnation Notice for the Structure at Issue (Application to Supplement). Therein, Troiani avers that on April 22, 2021, PLI posted "CONDEMNATION" notices (Condemnation Notices) on the First Avenue Structure and the Market Street Structures and issued "First Request for Compliance" notices (Compliance Notices) to Troiani for all of the structures, identifying the First Avenue Structure and the Market Street Structures as "Unsafe Structure[s]" under the International Property Maintenance Code. Application to Supplement at 2-3. *See also id.*, Attachments A, B. As corrective action, the Compliance Notices direct Troiani to seek permits to protect the public right-of-way; to "stabilize" the structures; and/or to seek approvals for the structures' demolition from PLI and the Department of City Planning. *Id.* Troiani attached supporting photographs of the Condemnation Notices and Compliance Notices as exhibits to its Application to Supplement.

At the May 13, 2021 argument before this Court, the City's counsel represented that the City did not oppose this Court taking judicial notice of the Condemnation Notices or the Compliance Notices. Accordingly, this Court grants the Application to Supplement.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Troiani Group and Troy Development  :
Associates, L.P.,  :
          Appellants  :
  :
      v.  :
  :
City of Pittsburgh Planning  :
Commission, City of Pittsburgh and  :   No. 85 C.D. 2021
Lumania Properties, L.P.  :

## O R D E R

AND NOW, this 21st day of March, 2022, the Allegheny County Common Pleas Court's January 11, 2021 order is affirmed.

Troiani Group and Troy Development Associates, L.P.'s Application to Request Judicial Notice and to Supplement the Record with the City's April 22, 2021 Condemnation Notice for the Structure at Issue is granted.

_____
ANNE E. COVEY, Judge